CHICAGO LIMOUSINE SERVICE, INC., Appellee and Cross-Appellant and Plaintiff-Counterdefendant, v. HARTIGAN CADILLAC, INC., Defendant (General Motors Acceptance Corporation, Appellant and Cross-Appellee and Defendant-Counterplaintiff).

First District (2nd Division) Nos. 1—87—2876, 1—87—3279 cons.

Opinion filed November 21, 1989.—Rehearing denied January 17, 1990.

BILANDIC, P.J., dissenting in part.

Becker & Tenenbaum, of Chicago (J. Samuel Tenenbaum, Theodore Becker, and Claire Durkin, of counsel), for appellant.

Foran, Wiss & Schultz, of Chicago (Stephen Gorman and Steven Gistenson, of counsel), for appellee.

JUSTICE HARTMAN delivered the opinion of the court:

This appeal involves a commercial dispute between a secured inventory lender and a rescinding purchaser, following default by a third-party borrower. Chicago Limousine Service, Inc. (CLS), brought a replevin action against Hartigan Cadillac, Inc. (Dealership),[1] and General Motors Acceptance Corporation (GMAC), the secured inventory lender of the Dealership, seeking possession of two 1985 Cadillac limousines. After a six-day bench trial, the circuit court awarded possession of the vehicles,[2] damages, and costs to CLS, and dismissed GMAC's affirmative defenses and counterclaim.

On appeal, GMAC questions whether the circuit court erred in

---

[1]The Dealership is not involved in this appeal.

[2]Ultimately sold, with proceeds held in escrow. See footnote No. 4.

finding that CLS had a superior right to possession of the vehicles and, alternatively, challenges the damage award. On cross-appeal, CLS claims the court erred in not awarding damages for the lost use and enjoyment of the vehicles. The following facts emerge from the evidence adduced at trial.

CLS provides private livery and limousine service to corporate and individual clients, and primarily uses stretch Cadillac and Lincoln limousines in its operations.

Since 1976, GMAC, the inventory lender to the Dealership under a security agreement (Agreement) dated May 26, 1976, advanced money to the latter for the purchase of its new car inventory (floor plan financing), as well as for costs incurred in converting new Cadillacs into stretch limousines. The Agreement gave the Dealership the right to sell the vehicles in the ordinary course of business and also provided that GMAC's security interest attached to proceeds derived from such sales, as well as to after-acquired property. Among the vehicles financed under this Agreement were two 1985 Cadillac limousines (subject vehicles), upon which the Dealership owed GMAC over $72,000 as of June 1986.

The Dealership began doing business with CLS in the summer of 1985. Around June 24, 1986, Alvin Golub (Al), the president of CLS, received a telephone call from Kenneth Schielka, the Dealership's general manager, inquiring whether CLS was interested in purchasing two 1985 stretch limousines for a price of $27,000, among other vehicles. Al told Schielka he wasn't interested, and the price was "out of line" since the 1987 models were about to come out. Nevertheless, Al told Schielka he would stop by the Dealership to discuss the matter, which he did the next day, and spoke with Schielka and James Hartigan, its president, regarding the two limousines. The subject limousines were similar to the type of vehicle CLS always purchased, and Al agreed to take them. Initially priced at $27,000, eventually they agreed on a price of $25,000 for each car.

Typically, CLS would not take immediate physical possession of vehicles purchased from the Dealership; CLS lacked adequate garage facilities, so it arranged that equipment installation be completed at the Dealership. Al told Hartigan he would be sending a man from CLS to install radios in the vehicles within a few days. Schielka advised Al that he would process the necessary paperwork and send salesman Tim Godomski to the CLS office the next day with the purchase documents. On the 25th and 26th of June, Godomski arrived at the CLS offices, where he and Al executed the necessary sales instruments, including a purchase order and invoice for each vehicle, a

form stating that CLS had taken delivery of the limousines on June 25, 1986, and a CLS check in the amount of $50,000 payable to the Dealership. The original documents were taken by Godomski and maintained by the Dealership in a "deal jacket" kept in its files, except for the check, which was deposited on June 27, 1986.

Around June 30, Schielka telephone Al and asked to cancel the deal since the Dealership had a buyer willing to pay more money for the two vehicles. Due to the good business relationship between CLS and the Dealership, Al agreed to cancel, telling Schielka to keep the cars and "just send me back my money." Within a day or two, Al received two checks for $25,000 each from the Dealership, which were deposited into the CLS account.

Around July 5, Al heard that GMAC had taken over the Dealership and called Schielka to inquire about the Dealership's financial situation. According to Al, he was not informed previously that the Dealership was experiencing financial difficulty. Schielka told Al that there should be no problem; nevertheless, Al immediately called CLS's bank in an attempt to stop payment on the $50,000 check to the Dealership. The check already had been paid, however.

CLS was informed on July 10 that the two $25,000 checks from the Dealership were dishonored. The debit notice from the bank directed the payee to "Refer to maker." Al called Schielka, who advised him that the checks would be made good. CLS never redeposited the checks. Previously, the Dealership had a line of credit with its bank to cover overdrafts. In early July, however, its bank froze the Dealership's account.

Prior to July 1, 1986, GMAC knew of the Dealership's financial problems, considering it one of the financially weaker dealerships "for a number of years." On July 2, GMAC learned the Dealership was "out of trust," meaning it had not turned over to GMAC the applicable proceeds derived from the sale of vehicles in which GMAC maintained a security interest. On that date, GMAC received one-half million dollars in checks from the Dealership which were dishonored. In response, Mark Daly, a control branch manager for GMAC, immediately placed Carl Swanson, a GMAC employee, at the Dealership to monitor the inventory. According to Daly, he did not ask Swanson on that day to determine which vehicles physically located on the premises had been sold; he did expect Swanson to ascertain such information eventually.

After July 2, Swanson or another GMAC employee was at the Dealership during all business hours. When the Dealership received a payment by check, it immediately was endorsed over to and depos-

ited by GMAC. At some point, GMAC took control of all keys to the vehicles on the premises. The public was not advised of GMAC's involvement at the Dealership, however.

On July 16, Al and Harold Golub went to the Dealership in person, where Schielka advised them he could not release the limousines. He referred them to Swanson, who claimed the cars belonged to GMAC. The Golubs then met with Hartigan, who signed a note[3] promising that the Dealership would pay CLS $50,000 if the limousines were not delivered within 30 days. Hartigan testified that as far as he was concerned, CLS bought the two vehicles from the Dealership. The Dealership never paid GMAC the $72,000 balance it owed for the subject vehicles.

Meanwhile, after talking with Golub, Swanson called Daly to advise him of that conversation. Swanson related that Golub described some transaction involving the purchase of the limousines by CLS and another in which CLS obtained a check from the Dealership; he told Daly he did not think the Golubs had the paperwork evidencing these transactions. Daly did not direct Swanson to investigate the matter with Schielka or check the Dealership's records.

Al called Daly and requested the subject vehicles. Daly told Al that CLS was not a good-faith purchaser of the two limousines; because of the two checks sent to CLS from the Dealership, Daly considered CLS to be an unsecured creditor. Daly also believed CLS was not a good-faith purchaser because it did not take physical possession of the vehicles and had paid under value for them. Based on these conclusions, Daly instructed Swanson not to release the vehicles to CLS. Daly admitted at trial, however, that he never talked to Schielka or Hartigan, nor asked Swanson to check the Dealership's records, nor caused GMAC to investigate CLS's claim. GMAC also continued to hold the certificates of origin for the subject vehicles.

CLS filed a complaint for replevin on August 21, 1986, against the Dealership and GMAC, claiming it was the owner and lawfully entitled to possession of the subject vehicles; the vehicles were being wrongfully detained by the Dealership and/or GMAC; and the value of the property was $50,000. The complaint sought possession of the vehicles, the value of the property not delivered, and damages.

In response, GMAC filed a motion to dismiss or in the alternative for judgment on the pleadings, which the circuit court denied on August 29, 1986, and then also entered a preliminary order for reple-

---

[3]This Note, dated July 16, 1986, was not signed by CLS. CLS never received the $50,000 referred to in the Note.

vin, finding CLS "established a *prima facie* case to a superior right to possession of the disputed property."

On January 5, 1987, the circuit court entered an order finding as premature GMAC's motion for judgment on the pleadings. GMAC then filed its verified answer, affirmative defenses, and counterclaim. The affirmative defenses asserted: (1) CLS was not a good-faith purchaser for value because it acted in bad faith by allowing the vehicles to remain at the Dealership, paid grossly inadequate value for the vehicles, and accepted checks from the Dealership in consideration for its interest in the vehicles or alternatively, as part of a "check kiting" scheme; and (2) CLS's acceptance of the two checks from the Dealership constituted a sale, thus rendering the vehicles "after acquired property" to which GMAC's · security interest attached. GMAC's counterclaim sought possession of the vehicles, the value of the property wrongfully withheld by CLS, and damages, based on the same rationales asserted in the affirmative defenses. CLS filed a verified reply to the affirmative defenses and a verified answer to the counterclaim.

Eight witnesses testified at the ensuing trial. On August 13, 1987, the circuit court found in favor of CLS and against GMAC on the complaint for replevin; it dismissed GMAC's affirmative defenses; and found for CLS on GMAC's countercomplaint, which was also dismissed. Further, the court determined CLS was entitled to possession of both vehicles.[4] The circuit court also entered a $19,100 judgment for CLS as damages against GMAC for wrongful detention of the limousines, but denied CLS rental value damages. From this judgment GMAC appeals, and CLS cross-appeals.

## I

■■ ■ The primary issue on appeal is whether CLS or GMAC had the superior right to possession of the two limousines under the provisions of the Uniform Commercial Code (Ill. Rev. Stat. 1985, ch. 26, par. 1—101 *et seq.*) (UCC). GMAC contends it has a security interest in the subject vehicles under UCC section 9—203(1) (Ill. Rev. Stat. 1985, ch. 26, par. 9—203(1)), which states, in part:

> "(1) *** [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless
>> (a) the collateral is in the possession of the secured party

---

[4]The two limousines had been sold at auction on June 27, 1987, near the end of the trial, for $40,600, and the proceeds deposited in an escrow account.

pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ***; and

(b) value has been given; and

(c) the debtor has rights in the collateral."

GMAC next asserts its rights are superior to those of CLS based on section 2—403(1) of the UCC (Ill. Rev. Stat. 1985, ch. 26, par. 2—403(1)), which provides, in part:

"(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. *A person with voidable title has power to transfer a good title to a good faith purchaser for value.* When goods have been delivered under a transaction of purchase the purchaser has such power *even though*

***

(b) *the delivery was in exchange for a check which is later dishonored ***.*" (Emphasis added.)

GMAC urges that CLS's acceptance of the Dealership's two checks in exchange for the cancellation of the original transaction constituted a "voluntary transfer" by CLS of its interest in the vehicles, characterizing CLS as a seller whose security interests arose because it accepted two subsequently dishonored checks from the Dealership (a debtor). Although the checks were later dishonored, continues GMAC, voidable title was passed to the Dealership, which nevertheless had the power to transfer good title under section 2—403(1). Describing itself as a good-faith purchaser from the Dealership, GMAC concludes it has a superior right to possession of the vehicles.

■ CLS, on the other hand, claims it was not a seller and disputes GMAC's characterization of the subsequent cancellation of the purchase agreement as a "sale." It argues it was a buyer in the ordinary course when it purchased the limousines in the original transaction, and retained that status after the Dealership unsuccessfully attempted to rescind the purchase agreement. CLS acknowledges GMAC's original perfected security interest in the Dealership's vehicles and proceeds from the sale of those vehicles, but relies on section 9—307(1) of the UCC (Ill. Rev. Stat. 1985, ch. 26, par. 9—307(1)), which declares, in part:

"[A] buyer in the ordinary course of business *** takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

Based upon its asserted status as a buyer in the ordinary course of business pursuant to section 9—307(1), CLS concludes it is entitled to possession of the two limousines.

■■ ■ Under section 9—203(1) of the UCC, a security interest in collateral attaches when (1) a security agreement containing a description of the collateral is signed by the debtor, (2) value is given by the secured party, and (3) the debtor acquires rights in the collateral. (Ill. Rev. Stat. 1985, ch. 26, par. 9—203(1); *Central National Bank v. Worden-Martin, Inc.* (1980), 90 Ill. App. 3d 601, 413 N.E.2d 539; see also *General Electric Credit Corp. v. Tidwell Industries, Inc.* (1977), 115 Ariz. 362, 364, 565 P.2d 868, 870.) In this case, the first two requirements clearly were satisfied. First, the Dealership signed an agreement which provided GMAC with a security interest in new and used vehicles held for sale or lease, "all vehicles of like kinds or types now owned *or hereafter acquired,*" and *"all additions and accessions thereto and all proceeds of such vehicles."* (Emphasis added.) This clause sufficiently describes the collateral in the instant case (vehicles of like kinds or types hereafter acquired) and meets the first requirement of section 9—203(1). (See *Tidwell Industries,* 115 Ariz. 362, 565 P.2d 868.) Second, GMAC advanced substantial amounts of money to the Dealership. The preexisting indebtedness of over $1.65 million owed to GMAC, including financing for the subject vehicles, constituted value given under the UCC (Ill. Rev. Stat. 1985, ch. 26, par. 1—201(44)), and satisfies the second element of section 9—203(1). *In re Samuels & Co.* (5th Cir. 1976), 526 F.2d 1238, 1242, *cert. denied sub nom. Stowers v. Mahon* (1976), 429 U.S. 834, 50 L. Ed. 2d 99, 97 S. Ct. 98.

The third requirement of section 9—203(1), whether the debtor (the Dealership) reacquired rights in the limousines, is a point of contention in this case. GMAC argues that the cancellation of the original transaction constituted a voluntary transfer of CLS's interest in the limousines back to the Dealership; CLS responds that the failed rescission between it and the Dealership resulted in the original sales contract for the vehicles remaining in effect and its retention of status as a buyer in the ordinary course of business with a superior right to possession.

The original transaction clearly constituted a sale to CLS, which transferred the Dealership's interest in the vehicles to CLS and converted GMAC's security interest into the proceeds of the sale. We must determine now the effect of the rescission between CLS and the Dealership, specifically, whether the rescission caused title to the vehicles to return to the Dealership when those parties sought to

cancel the transaction, thereby becoming subject to GMAC's perfected security interest in after-acquired property.

■ CLS correctly asserts that a contract can be cancelled or rescinded by agreement of the parties. (*Volk v. Kendall* (1979), 71 Ill. App. 3d 211, 213, 389 N.E.2d 697.) Also, CLS properly observes:

> " 'To be entitled to rescind the contract of sale the buyer must first comply with conditions precedent, such as by returning or offering to return the goods to the seller \*\*\*. Where the buyer puts it out of his power to return the goods he thereby also puts it out of his power to rescind the contract.' " (*Tobey v. Sundling* (1974), 25 Ill. App. 3d 205, 211, 323 N.E.2d 30, quoting 32 Ill. L. & Prac. *Sales* §67, at 389 (1957).)

CLS argues that in the instant case, the Dealership failed to comply with a condition precedent, namely, returning what it received.

■ The determination of whether a debtor acquires title depends upon the intentions of the parties. In *Central National Bank v. Worden-Martin, Inc.* (1980), 90 Ill. App. 3d 601, 603-04, 413 N.E.2d 539, a debtor was given possession of a car upon his promise of later payment; although the debtor's check subsequently was dishonored, the court held the parties intended the transaction to be a credit sale which immediately passed title from the transferor. Similarly, the record in the instant case shows that the parties to the June 30 rescission intended the possessory interest in the vehicles to return immediately to the Dealership in exchange for subsequent payment. Indeed, the express purpose of the rescission, as demonstrated by the evidence, was that the Dealership reacquire the vehicles for an imminent resale to a higher-paying customer. The rescission was complete, and the interest in the vehicles transferred, when the Dealership tendered the two checks to CLS in return for the "cancellation" of the sale, and CLS accepted and deposited them.

Further, at the time of the rescission, the Dealership did not "put it out of its power" to return the $50,000. (*Tobey v. Sundling*, 25 Ill. App. 3d at 211.) No record evidence suggests the Dealership knew it did not have the ability to return the $50,000, which would have meant it did not have the power to enter into the agreement to rescind. Rather, the bank froze the Dealership's account in early July, after the rescission agreement of June 30. At oral argument, CLS conceded that no record evidence existed to demonstrate the Dealership knew it was insolvent when it wrote the subsequently dishonored checks. To the contrary, GMAC suggested that the Dealership believed it could cover the checks based upon $1 million in overdraft

protection it thought it had from the bank.

■ CLS insists that the rescission did not transfer interest in the vehicles until the $50,000 check from the Dealership cleared. As we have seen, however, section 2—403(1) of the UCC allows a person to acquire voidable title in property although delivery is in exchange for a subsequently dishonored check. Whether the second transaction constituted a "sale" by CLS, or not, it did operate to transfer CLS's interest in the two limousines back to the Dealership. Section 2—403 is "applicable to a person taking by any form of 'purchase' as defined by" the UCC (see Ill. Ann. Stat., ch. 26, par. 2—403, Uniform Commercial Code Comment 1, at 332 (Smith-Hurd 1963)); under the UCC, purchase includes "taking by sale, discount, negotiation, mortgage, pledge, lien, issue or reissue, gift *or any other voluntary transaction creating an interest in property.*" (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 26, par. 1—201(32).) Here, the voluntary agreement to rescind created an interest in the vehicles for the Dealership, which vehicles then became subject to the after-acquired property clause in the Agreement between the Dealership and GMAC.

In summary, the requirement that the debtor acquire rights in the collateral was satisfied when the Dealership obtained its interest in the two limousines pursuant to the rescission agreement; under section 9—203(1), GMAC's Article 9 interest attached to the subject vehicles, to the exclusion of any interest claimed by CLS.

## II

As noted, the Dealership received only voidable title in the limousines because it paid with subsequently dishonored checks, but the Dealership nevertheless had the power to transfer good title to a good-faith purchaser for value under section 2—403(1)(b). The issue then becomes one of priority: if the Article 9 secured party (GMAC) was a good-faith purchaser for value, it is prior under section 2—403(1) to the aggrieved transferor (CLS). *In re Samuels & Co.*, 526 F.2d at 1243.

■ Under the secured transactions provisions of the UCC, the general definition of "good faith" set forth in section 1—201(19) of the UCC is applicable. (*Massey-Ferguson, Inc. v. Helland* (1982), 105 Ill. App. 3d 648, 653, 434 N.E.2d 295.) That section provides (Ill. Rev. Stat. 1985, ch. 26, par. 1—201(19)) that " 'Good faith' means honesty in fact in the conduct or transaction concerned." Examples of bad faith might include "lies, deceit, overreaching or other examples of dishonesty in fact in the transaction." (*Massey-Ferguson, Inc.*, 105 Ill. App. 3d at 654.) Further, "good faith" may require that the

purchaser take its interest without notice of the outstanding claims of others. The concepts of good faith and notice, while distinct, may be "intertwined and facts which are sufficient to constitute notice may impeach the claim of good faith." 1 R. Anderson, Uniform Commercial Code, §1—201:123, at 252 (3d ed. 1981).

 In this case, the circuit court analyzed the evidence and initially found bad faith on the part of GMAC, based on GMAC's: knowledge of the Dealership's poor financial condition; presence at the Dealership based on its knowledge of the insolvency; refusal to inquire into CLS's claim or check the records at the Dealership; unjustified refusal to deliver the limousines to CLS upon demand; and subsequent attempts to justify its actions. Later, the court variously stated: "the bad faith *** isn't bad faith that they [GMAC] did anything wrong"; that GMAC acted with "comparatively" less good faith than the other party; and that GMAC had not "acted improperly." The record does reveal that GMAC eventually learned of CLS's purchase of the limousines but refused to release the vehicles; the deal jackets containing the documents of purchase were not found until a search was initiated by reason of the litigation; and GMAC exercised extensive control of the Dealership's operations. There is no evidence that GMAC participated in the decision to freeze the Dealership's bank account. From the foregoing, the circuit court's position as to whether GMAC was a good-faith purchaser is patently ambiguous and unclear.

Whether the circuit court found bad faith on the part of GMAC or equivocated with its rather novel finding of "comparative good faith" need not be determinative of the right to possession of the vehicles in any event, as the following discussion demonstrates.

### III

 █ Assuming, *arguendo*, that GMAC did not have a superior interest under section 2—403(1), the right to possession of the limousines ultimately rests upon a resolution of the priority between the parties. The priority provisions of Article 9 (Ill. Rev. Stat. 1985, ch. 26, par. 9—312(5)(a)) declare:

"In all cases not governed by other rules ***, priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided

that there is no period thereafter when there is neither filing nor perfection."

As previously noted, the Dealership reacquired an interest in the limousines (albeit voidable) by virtue of the rescission agreement; GMAC's security interest in after-acquired property immediately attached pursuant to the underlying perfected security agreement signed by the Dealership. In contrast, there is no evidence that CLS ever perfected a security interest in the vehicles under any method available under Article 9. As a result, GMAC must be held to have possessed a prior security interest. The circuit court erred in awarding possession of the subject vehicles to CLS. This seemingly harsh result is mandated under the facts of the case and the applicable provisions of the UCC. We fail to see how this results in a double recovery as claimed by CLS, since GMAC was never paid for financing the limousines by the Dealership. GMAC is not seeking to penalize CLS, as suggested by the dissent; rather, it is asserting its rights under the UCC to protect itself. It is the Dealership's insolvency, and not GMAC's actions, which created this hardship for CLS.

It should be noted that CLS was not without remedy as an aggrieved transferor and could have reclaimed the vehicles, which claim would have been superior to any then possessed by GMAC. Pursuant to UCC sections 2—507(2), 2—511(3) and 2—702 (Ill. Rev. Stat. 1985, ch. 26, pars. 2—507(2), 2—511(3), 2—702), a seller of goods who received payment by a subsequently dishonored check has a right to reclaim the goods from the buyer within 10 days after their delivery. (See *Holiday Rambler Corp. v. First National Bank & Trust Co.* (10th Cir. 1983), 723 F.2d 1449, 1451-52.) According to UCC Comment 2 of section 2—702 (Ill. Ann. Stat., ch. 26, par. 2—702, Uniform Commercial Code Comment 2, at 510 (Smith-Hurd 1963)), and, expressly applicable here (see Ill. Ann. Stat., ch. 26, par. 2—507, Uniform Commercial Code Comment 3, at 385-86 (Smith-Hurd 1963)): "The ten day limitation period operates from the time of receipt of the goods." Thus, in the case at bar, CLS had 10 days to reclaim the vehicles after the Dealership "received" them, *i.e.,* 10 days after the June 30 rescission operated to "deliver" the interest in the limousines to the Dealership.

During the 10-day[5] period, this right of reclamation would not

---

[5]The circuit court erroneously ruled that CLS had 21 days within which to reclaim the vehicles; that period of time (actually, 20 days) is referable only to the rights of a secured creditor under UCC section 9—306 (Ill. Rev. Stat. 1985, ch. 26, par. 9—306) within which to perfect its security interest, a procedure which CLS never invoked.

have been subject to GMAC's remedies under Article 9. Further, it might not have been subject to GMAC's rights under section 2—403, if GMAC were to have been found lacking in good faith, upon further clarification by the circuit court. If a seller fails to timely assert his rights, however, he loses his right to reclaim; after 10 days, the sale is no longer conditional, and the buyer can sell or give a security interest to a subsequent purchaser free of the transferor's right to reclaim. (*Holiday Rambler Corp.*, 723 F.2d at 1452.) Here, because CLS did not attempt to reclaim the vehicles until July 16, beyond the 10-day period, which began running on June 30, CLS must be held to have failed to timely assert its rights; GMAC's perfected security interest therefore prevails.[6]

## IV

■■ GMAC requests damages from CLS under section 19—123 of the replevin statute (Ill. Rev. Stat. 1985, ch. 110, par. 19—123), which provides that in a replevin action, "where the right of property is adjudged against the plaintiff, the defendant is entitled to damages in the amount of the use of the property from the time of its taking until its return." (*International Harvester Credit Corp. v. Helland* (1986), 151 Ill. App. 3d 848, 856, 503 N.E.2d 548.) GMAC suggests CLS wrongfully obtained possession of the two limousines and is liable for damages.

■■ We fail to see how CLS "wrongfully detained" the limousines and precluded GMAC's "use" of the vehicles. From the time of CLS's first demand for possession (July 16), GMAC exerted total control over the vehicles, as evidenced by its refusal to release them to CLS. Further, the vehicles were maintained at the Dealership's premises during GMAC's presence there. The first arguable possession by CLS did not occur until entry of the August 19, 1986, order for replevin. Shortly thereafter, on September 12, CLS and GMAC entered into an agreed order which provided that neither party could transfer any interest in the limousines without prior order of the court or written agreement between the parties. GMAC never acted to modify the order before the vehicles were sold at auction. Under the circumstances, GMAC cannot contend that CLS precluded any use of the vehicles so as to entitle GMAC to damages.

---

[6]We are not convinced, as is the dissent, that CLS was not "sophisticated" in commercial transactions. We note that CLS attempted to turn over half of its fleet of at least 27 limousines every other year, which necessarily involved numerous purchases and resales of vehicles in the course of its operations.

For the reasons set forth above, we reverse the judgment of the circuit court and remand with directions to award the funds held in escrow, representing the right to possession of the vehicles, to GMAC. As a result of this disposition, we need not address GMAC's challenge of the damage award or CLS's cross-appeal.

Reversed and remanded.

DiVITO, J., concurs.

PRESIDING JUSTICE BILANDIC, dissenting in part:
I agree with the majority's disposition of issue IV. However, I respectfully dissent from the majority's opinion for issues I, II, and III.

The two limousines involved in this case had their origin with a manufacturer. Hartigan's role as the dealer was to market and distribute the limousines to ultimate users. GMAC's inventory financing provided the necessary capital for Hartigan to purchase vehicles from the manufacturer. CLS was the ultimate user that purchased the two limousines from the dealer.

GMAC's security agreement with the dealer permitted the sale of the two limousines to CLS (an ultimate user) free and clear of any inventory lien in favor of GMAC. However, as correctly stated by the majority, GMAC's security interest attached to the proceeds of the sale to CLS. Thus, GMAC exchanged its lien on the limousines for a lien on the $50,000 paid by CLS to Hartigan.

GMAC is Hartigan's banker. The majority view would make CLS the banker. Bankers are constantly concerned with the possible insolvency of their debtors. However, the ultimate user who purchases vehicles from an authorized dealer of a major manufacturer, and pays cash for the vehicles, should be able to do so with the confidence that he acquired good title.

Therefore, on June 26, 1986, CLS acquired title to the limousines; GMAC acquired a lien on the $50,000 paid by CLS to Hartigan. Because GMAC was not vigilant in enforcing its lien on the proceeds, it now seeks to penalize CLS.

On appeal, the facts and inferences are to be construed against the appealing party—here, GMAC. (*Heimberger v. Chebanse* (1984), 124 Ill. App. 3d 310, 463 N.E.2d 1368.) It is the appellate court's "obligation to accept those inferences arising from the conflicting nature of the evidence which support the judgment of the trial court." (*In re Estate of Gigele* (1978), 64 Ill. App. 3d 136, 139, 380

N.E.2d 1144.) Any doubts which may arise from the incompleteness of the record will be resolved against the appellant. (*Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 392, 459 N.E.2d 958.) In the absence of a record sufficient to establish the error urged on review, a reviewing court will indulge in every presumption favorable to the judgment or order appealed from. *Village of Hillside v. John Sexton Sand & Gravel Corp.* (1983), 113 Ill. App. 3d 807, 447 N.E.2d 1047.

Applying these standards of review to the facts of this case, I conclude that the trial court correctly determined that CLS was entitled to possession in spite of the alleged priority asserted by GMAC.

The majority grants a priority to GMAC by concluding that Hartigan reacquired an interest in the limousines from CLS after June 26, 1986, and, therefore, GMAC's lien reattached to defeat the interest of CLS. I respectfully disagree with this conclusion.

The owners of CLS are livery drivers, not sophisticated financiers. They did not need nor want to purchase the limousines. They yielded to Hartigan's pitch of a deal they could not refuse.

On June 30, 1986, the dealer came calling again. This time the dealer wanted to reacquire the two limousines so that the dealer could profit by a resale at a higher price. Because of the accommodating nature of CLS to Hartigan, the majority holds that Hartigan reacquired an interest in the limousines by reason of the Uniform Commercial Code and the after-acquired property clause of the security agreement between GMAC and Hartigan. Since the limousines were reacquired by Hartigan, the lien of GMAC is reattached. In my opinion, this reasoning is fallacious.

The Uniform Commercial Code provides in part:

"§1—102. *** (1) This Act shall be liberally construed and applied to promote its underlying purposes and policies.

(2) Underlying purposes and policies of this Act are:

(a) to simplify, clarify and modernize the law governing commercial transactions;

(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the practices;" Ill. Rev. Stat. 1985, ch. 26, par. 1—102.

The Uniform Commercial Code's policy that "the principles of law and equity *** shall supplement [the Uniform Commercial Code's] provisions" also applies. Ill. Rev. Stat. 1985, ch. 26, par. 1—103.

Certainly CLS did not intend to part with $50,000 cash and the two limousines. Under the facts of this case, I believe that the return of the $50,000 to CLS and the return of the two limousines to Harti-

gan was to be simultaneous. Hartigan did not return the cash so it did not reacquire any interest in the limousines. Without a reacquired interest by Hartigan, there is nothing upon which GMAC's lien could be reasserted.

Under the facts of this case, in determining the competing rights of a good-faith purchaser from an authorized automobile dealer and the inventory financier of the dealer, logic, law and equity compel me to come down on the side of the purchaser.

Accordingly, I would affirm.