(No. 69878.—

CHICAGO LIMOUSINE SERVICE, INC., Appellant, v. HARTIGAN CADILLAC, INC., *et al.* (General Motors Acceptance Corporation, Appellee).

*Opinion filed November 21, 1990.*

Stephen A. Gorman and Steven H. Gistenson, of Foran, Wiss & Schultz, of Chicago, for appellant.

J. Samuel Tenenbaum and Claire Toomey Durkin, of Tenenbaum & Senderowitz, of Chicago, for appellee.

JUSTICE CALVO delivered the opinion of the court:

Plaintiff, Chicago Limousine Service, Inc. (CLS), filed this replevin action in the circuit court of Cook County against Hartigan Cadillac, Inc. (the Dealership), and Gen-

eral Motors Acceptance Corporation (GMAC), seeking possession of two 1985 Cadillac limousines, the value of the property not delivered, and damages for detention. GMAC responded by filing a motion which sought dismissal of the action or, in the alternative, judgment on the pleadings. The circuit court denied the former request for relief and ruled the latter request premature. Thereafter, GMAC filed a verified answer, affirmative defenses, and a counterclaim. It does not appear that the Dealership filed any appearance or pleading in the circuit court, nor. for that matter has it participated in the appellate process. Following a bench trial, the circuit court awarded CLS possession of the vehicles (actually proceeds held in escrow from the sale thereof), damages and costs. The court dismissed GMAC's affirmative defenses and counterclaim.

In the appeal which followed, the appellate court, one justice dissenting, reversed the judgment of the circuit court and remanded "with directions to award the funds held in escrow, representing the right to possession of the vehicles, to GMAC." (191 Ill. App. 3d 886, 901.) We granted CLS's petition for leave to appeal (107 Ill. 2d R. 315) and, for reasons which will appear hereafter, we hereby reverse the judgment of the appellate court and remand the cause to the appellate court for consideration of those issues (GMAC's challenge of the damage award and CLS's cross-appeal) which were there raised, briefed and argued but were not addressed by that court because of the disposition of the case. (191 Ill. App. 3d at 889-90, 901.) The following facts are pertinent to our decision.

CLS provides private livery service to corporate and individual clients, using primarily Cadillac and Lincoln limousines in its operations. CLS has been owned and operated by Alvin and Harold Golub since 1970, and began doing business with the Dealership in the summer of

1985. According to Alvin Golub, CLS and the Dealership had a good business relationship.

GMAC had advanced money to the Dealership for the purchase of its new car inventory pursuant to a security agreement dated May 26, 1976. Under the terms of the security agreement, the Dealership was authorized to sell vehicles in the ordinary course of business and GMAC's security interest attached not only to the proceeds derived from such sales, but also to after-acquired property. The two 1985 Cadillac limousines which are the subject of this litigation were financed under the security agreement. As of June 1986, the Dealership owed GMAC over $72,000 on the two limousines.

Negotiations for the sale of the limousines were initiated around June 24, 1986, by the Dealership's general manager, Kenneth Schielka, who called Alvin Golub, inquiring whether CLS was interested in purchasing two 1985 stretch limousines for a price of $27,000 each. Golub told Schielka he was not interested, and the price was too high since the 1987 models were about to come out. However, Golub agreed to stop by the Dealership and discuss the matter further the next day. Subsequent negotiations proved fruitful. Since the two limousines were similar to the type of vehicle CLS always purchased, and since Schielka and James Hartigan, the Dealership's president, were willing to reduce the price even further to $25,000 for each car, Golub agreed to purchase them.

As had been the case in previous transactions between the parties, CLS did not take immediate physical possession of the limousines. Because CLS lacked adequate garage facilities, it arranged for equipment installation to be completed at the Dealership. Golub informed the Dealership that CLS would be sending someone to install radios in the limousines within a few days. Schielka told Golub one of the Dealership's salesmen would stop by CLS's office the next day with the purchase documents.

On the 25th and 26th of June, a salesman from the Dealership met with Golub at the CLS offices, where he and Golub executed sales instruments, including a purchase order and invoice for the vehicles, a form stating that CLS had taken delivery of the limousines on June 25, 1986, and a CLS check in the amount of $50,000 payable to the Dealership. The original documents were returned to the Dealership, where they were placed in a "deal jacket" which was maintained in the Dealership's files. CLS's check was deposited on June 27, 1986.

Around June 30, Schielka telephoned Alvin Golub and asked to "cancel" the deal because the Dealership had a buyer willing to pay more money for the vehicles. Due to the good business relationship between the parties, Golub agreed to what would in effect have been a rescission, telling Schielka, "[K]eep the cars. Just send me back my money." Within a day or two of this conversation, CLS received two checks from the Dealership. Each check was for $25,000 and both were subsequently deposited into CLS's account.

Around July 5, Golub heard that GMAC had taken over the Dealership. According to Golub, he had not been informed, prior to that time, that the Dealership was experiencing financial difficulty. Golub telephoned Schielka to inquire as to the Dealership's financial condition. Schielka assured Golub that there should be no problem. Nonetheless, Golub called CLS's bank in an attempt to stop payment on the $50,000 check CLS had issued to the Dealership. The check had already been paid.

On July 10, CLS received notice that the two $25,000 checks from the Dealership had been dishonored. The debit notice from the bank directed CLS to "refer to maker." Golub again called Schielka, who told Golub that the Dealership would make sure the checks were paid. CLS did not redeposit the checks; nor does it appear that any purpose would have been served by pursuing that

course of action. In early July, the Dealership's bank had frozen its account, and with it a line of credit which the bank had extended to the Dealership to cover overdrafts. The bank's action affected not only the checks written to CLS, but also numerous checks written to GMAC.

Even before July 1986, GMAC was aware of the Dealership's financial problems. On July 2, GMAC discovered the Dealership had not turned over to GMAC the proceeds derived from the sale of vehicles in which GMAC maintained a security interest. On that date, GMAC received checks from the Dealership which were dishonored. In an attempt to monitor the Dealership's inventory and protect GMAC's interest, Mark Daly, a control branch manager for GMAC, immediately dispatched Carl Swanson, a GMAC employee, to the Dealership.

Thereafter, Swanson was on the Dealership's premises during all business hours. Checks received by the Dealership were immediately endorsed over to and deposited by GMAC. Eventually, GMAC took control of all keys to vehicles on the premises. The public was not apprised of GMAC's intervention.

On July 16, Alvin and Harold Golub went to the Dealership in an attempt to obtain the $50,000 or the vehicles. Schielka told the Golubs he could not release the limousines and he referred them to Swanson, who claimed the cars belonged to GMAC. No evidence suggests that Swanson had determined which vehicles located on the premises had been sold. Following their unproductive discussion with Swanson, the Golubs met with the Dealership's president, James Hartigan, who signed a note promising that the Dealership would pay CLS $50,000 if the two limousines were not delivered within 30 days. Hartigan later testified that, as far as he was concerned, CLS bought the two limousines from the Dealership. The Dealership never paid GMAC the $72,000 balance owed for the two limousines, nor does it

appear that the Dealership paid CLS the promised $50,000.

After talking to the Golubs, Swanson called Daly and advised him of that conversation. Swanson told Daly that Golub had described a transaction involving the purchase of the limousines by CLS, and another in which CLS obtained a check from the Dealership. Swanson advised Daly that he did not think the Golubs had the documentation evidencing the transactions. Daly did not order Swanson to pursue the matter with Schielka or check the Dealership's records.

Apparently dissatisfied after his discussions with Swanson and Dealership personnel, Alvin Golub called Daly and requested the limousines. Daly told Golub that CLS was not a good-faith purchaser of the limousines because it did not take physical possession of the vehicles and had paid undervalue for them. Because of the two checks sent to CLS from the Dealership, Daly considered CLS to be an unsecured creditor. Based on his conclusions, Daly instructed Swanson not to release the limousines to CLS. At trial, Daly admitted he had never talked to Schielka or Hartigan, nor had he asked Swanson to check the Dealership's records or otherwise investigate CLS's claim.

On August 21, 1986, CLS filed a complaint for replevin against the Dealership and GMAC, claiming that it was the owner of the two limousines and that it was lawfully entitled to possession of the vehicles which were being wrongfully detained by the Dealership and/or GMAC. CLS sought possession of the vehicles, the value of the property not delivered, and damages.

GMAC responded by filing a motion which sought dismissal of the action or, in the alternative, judgment on the pleadings. On August 29, 1986, the circuit court denied GMAC's motion to dismiss and entered a preliminary order for replevin, finding CLS had "established a

*prima facie* case to a superior right to possession of the disputed property."

On January 5, 1987, the circuit court entered an order by which it ruled that GMAC's motion for judgment on the pleadings was premature. Thereafter, GMAC filed a verified answer, affirmative defenses, and a counterclaim. By means of its affirmative defenses, GMAC asserted that (1) CLS was not a good-faith purchaser for value in that it acted in bad faith by allowing the limousines to remain at the Dealership, paid grossly inadequate value for the vehicles, and accepted checks from the Dealership in consideration for its interest in the vehicles or, alternatively, as part of a "check kiting" scheme, and (2) CLS's acceptance of the checks from the Dealership constituted a sale, rendering the vehicles "after acquired property" subject to GMAC's security interest. By its counterclaim, GMAC sought possession of the vehicles, the value of the property wrongfully withheld by CLS, and damages.

After a bench trial, wherein eight witnesses testified, the circuit court, on August 13, 1987, found in favor of CLS on the complaint for replevin, and dismissed GMAC's affirmative defenses and countercomplaint. The court ruled that CLS was entitled to possession of both vehicles. Since the vehicles had been sold at auction on June 27, 1987, for $40,600, the court's ruling, in effect, entitled CLS to the proceeds from the sale. The circuit court also entered a $19,100 judgment for CLS, representing a damage award for GMAC's wrongful detention of the limousines. From these rulings, GMAC appealed, and CLS cross-appealed.

The appellate court, one justice dissenting, reversed and remanded the cause to the circuit court with directions to award the proceeds from the sale of the vehicles to GMAC. (191 Ill. App. 3d at 901.) In reversing the cir-

cuit court, the appellate majority premised its decision upon the following determination:

> "[T]he dealership reacquired an interest in the limousines (albeit voidable) by virtue of the rescission agreement [between CLS and the Dealership]; GMAC's security interest in the after-acquired property immediately attached pursuant to the underlying perfected security agreement signed by the Dealership." (191 Ill. App. 3d at 899.)

From this determination, the appellate court embarked upon an analytical expedition through the intricate terrain of the Uniform Commercial Code (Ill. Rev. Stat. 1985, ch. 26, par. 1—101 *et seq.*), arriving at the conclusion that the circuit court had erred in awarding possession of the limousines to CLS. Recognizing the "seemingly harsh result" wrought by its decision, the appellate court maintained said result was "mandated under the facts of the case and the applicable provisions of the UCC." (191 Ill. App. 3d at 899.) We disagree with the court's initial premise and the conclusion to which it leads.

The appellate court's entire analysis is founded upon its interpretation of section 2—403(1) of the UCC (Ill. Rev. Stat. 1985, ch. 26, par. 2—403(1)), which provides in pertinent part:

> "(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though
>
>     ***
>
> (b) the delivery was in exchange for a check which is later dishonored ***."

Accepting GMAC's interpretation of section 2—403(1), the appellate court theorized that the Dealership "pur-

chased" the vehicles from CLS when it delivered checks which were later dishonored, thereby acquiring "voidable title" which empowered it to transfer "good title" to GMAC, a "good-faith purchaser." Of course, the appellate court declined to specifically *find* that GMAC was a good-faith purchaser, noting in fact that the circuit court had found "bad faith on the part of GMAC." (191 Ill. App. 3d at 898.) We need not address this apparent analytical infirmity, however, because the "second transaction" between CLS and the Dealership was not a "purchase" of goods as defined in the UCC. The appellate court's confusion with respect to the appropriate characterization of the "transaction" is manifest in its opinion. Having previously characterized the transaction as a completed "rescission," the court later avoided determining whether a "sale" by CLS had taken place, ultimately concluding that a "purchase" had been effected:

> "Whether the second transaction constituted a 'sale' by CLS, or not, it did operate to transfer CLS's interest in the two limousines back to the Dealership. Section 2—403 is 'applicable to a person taking by any form of "purchase" as defined by' the UCC (see Ill. Ann. Stat., ch. 26, par. 2—403, Uniform Commercial Code Comment 1, at 332 (Smith-Hurd 1963)); under the UCC, purchase includes 'taking by sale, discount, negotiation, mortgage, pledge, lien, issue or reissue, gift *or any other voluntary transaction creating an interest in property.*' (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 26, par. 1—201(32).)" 191 Ill. App. 3d at 897.

The error in the appellate court's reasoning is that, even if a completed rescission had taken place, as both the appellate and circuit courts found, it would not have *created* an interest in property as required under the UCC's broad definition of "purchase." (Ill. Rev. Stat. 1985, ch. 26, par. 1—201(32).) Quite the contrary, to rescind is to "declare a contract void in its inception and to put an end to it as though it never were. [Citation.] A

'rescission' amounts to the unmaking of a contract, or undoing of it from the beginning." (Black's Law Dictionary 1306 (6th ed. 1990); see also 17A C.J.S. *Contracts* §385(2), at 457 (1963).) A completed rescission in this case would not have been a "purchase," as that term is used in the UCC, because it would not have "created" a property interest in the Dealership. Rather, it would have "annulled" an interest in CLS. Section 2—403(1) is inapplicable here since there was no "purchase" by the Dealership.

For the same reasons, the "second transaction" between CLS and the Dealership was not a "sale" as that term is defined in section 2—106(1) of the UCC (Ill. Rev. Stat. 1985, ch. 26, par. 2—106(1)). "Sale" is subsumed within the UCC's definition of "purchase." (Ill. Rev. Stat. 1985, ch. 26, par. 1—201(32).) Where there is no purchase, there is no sale.

Clearly, the parties did not intend a sale to the Dealership when they agreed to undo what they had previously done. Although the UCC definitions of "purchase" and "sale" are broad indeed, we do not believe this court is compelled to ignore the commercial reality of the situation, or the parties' intent, and engage in a form of legal alchemy, thus transforming the "seller" into the "buyer" and the "buyer" into the "seller." We quote, with approval, from *First Bank & Trust Co. v. Post* (1973), 10 Ill. App. 3d 127, 131:

> "The Uniform Commercial Code was enacted to provide a general uniformity in commercial transactions conducted in this state and was never intended to be used by courts to create a result that is contrary to the clearly understood intentions of the original parties."

Pursuant to section 1—103 of the UCC (Ill. Rev. Stat. 1985, ch. 26, par. 1—103), we turn to "principles of law and equity" which supplement the Code, specifically the law of contract rescission.

Generally, contracts—even fully executed ones (*Finke v. Woodard* (1984), 122 Ill. App. 3d 911, 918; 17A C.J.S. *Contracts* §385(2), at 458 (1963))—can be cancelled or rescinded by mutual consent of the parties or judicial decree. (*Copley v. Pekin Insurance Co.* (1986), 111 Ill. 2d 76, 86; *Volk v. Kendall* (1979), 71 Ill. App. 3d 211, 213; *Finke*, 122 Ill. App. 3d at 918.) "Rescission" means "to restore the parties to their former position[;] *** a termination of a contract with restitution." 17A C.J.S. *Contracts* §385(2), at 458 (1963).

CLS and the Dealership clearly intended to restore the *status quo ante* when they entered into the agreement to rescind the sale of the limousines. Neither CLS nor the Dealership intended for an interest in the vehicles to pass to the Dealership upon CLS's receipt of two worthless checks. The Dealership's subsequent promises to make good on the checks indicate as much, as does Alvin Golub's statements at the time of the agreement, instructing the Dealership to "send me back my *money*." (Emphasis added.) The UCC equates "money" with government sanctioned currency. (Ill. Rev. Stat. 1985, ch. 26, pars. 1—201(24), 3—107.) Clearly, what was envisioned by the parties was a simultaneous exchange of the limousines for $50,000. Since that did not occur as planned, there was no completed rescission effectuating the parties' intent as expressed in their agreement. Payment by check is conditional and is defeated as between the parties by dishonor of the check on presentment. (Ill. Rev. Stat. 1985, ch. 26, par. 2—511(3); *Cullotta v. Kemper Corp.* (1979), 78 Ill. 2d 25, 29.) Although the general rule may be altered by the express or implied intentions of the parties (*Cullotta*, 78 Ill. 2d at 29), we find no evidence of such intent here. The second transaction between CLS and the Dealership was thus a failed attempt by the parties to rescind the original, valid sale to CLS. Since the Dealership possessed no rights in the vehicles, there was

nothing to which GMAC's security interest could attach so as to be enforceable against CLS. See Ill. Rev. Stat. 1985, ch. 26, par. 9—203(1)(c).

We are aware there are those who would, in the context of article 2 of the UCC, abolish altogether the right of one party to rescind a contract (J. White & R. Summers, Uniform Commercial Code §8—1, at 346-47 (3d ed. 1988))—which is to be distinguished from mutual rescission (17A C.J.S. *Contracts* §386, at 458 (1963))—and replace it with the UCC provisions concerning cancellation (Ill. Rev. Stat. 1985, ch. 26, pars. 2—106(4), 2—720), rejection of goods (Ill. Rev. Stat. 1985, ch. 26, pars. 2—601, 2—602), and revocation of acceptance (Ill. Rev. Stat. 1985, ch. 26, par. 2—608). With respect to "unilateral rescission," the foregoing UCC provisions may, perhaps, preempt the field, as some contend (J. White & R. Summers, Uniform Commercial Code §8—1, at 347 (3d ed. 1988)); however, we do not believe the UCC has preempted or abolished "mutual rescission." As this case demonstrates, there are circumstances which the UCC's provisions do not specifically address. Here, the contract had been fully executed without a breach by either party. Therefore, cancellation, termination, rejection, and revocation of acceptance are inapplicable. It seems to us that parties to such a contract, who act in good faith, should be able to agree to restore the *status quo ante* where to do so would not impair the existing contractual rights of third parties.

For the foregoing reasons, we reverse the judgment of the appellate court and remand the cause to the appellate court for consideration of those issues which were there raised, briefed and argued but were not addressed by that court because of its disposition of the case.

*Reversed and remanded*
*with directions.*