In re John R. McALLISTER, Debtor.

HOC, INC., Plaintiff,

v.

John R. McALLISTER, Defendant.

Bankruptcy No. 95–03468–BGC–7.
Adversary No. 95–00419.

United States District Court,
N.D. Alabama,
Southern Division.

April 16, 1997.

Mr. McAllister and Mr. Gould; the record in the case; numerous exhibits offered by the parties; and the arguments and briefs of counsel.[1]

## I. ISSUES

Issue No. 1 is whether the debts created by the debtor's failure to remit proceeds from the sale of automobiles financed by the plaintiff are nondischargeable either under the "willful and malicious" provision of 11 U.S.C. § 523(a)(6) or the "fraud" provision of 11 U.S.C. § 523(a)(2)(A) or the "embezzlement" provision of 11 U.S.C. § 523(a)(4).

Issue No. 2 is whether the debtor should be denied a discharge under the "false oath" provision of 11 U.S.C. § 727(a)(4)(A).

Wayne Wheeler, Birmingham, AL, for plaintiff.

Leo E. Costello, Birmingham, AL, for debtor.

## MEMORANDUM OPINION ON COMPLAINT TO ESTABLISH NON–DISCHARGEABILITY OF DEBTS AND ON OBJECTION TO DISCHARGE

BENJAMIN COHEN, Bankruptcy Judge.

The matters subject to this Memorandum Opinion and accompanying Order are the plaintiff's *Complaint to Establish Non–Dischargeability of Debt* and its *Amended Complaint* objecting to the debtor's discharge. A trial on both matters was held on February 5, 1997. Mr. John R. McAllister, the debtor; Mr. George Gould, the plaintiff's representative; Mr. Wayne Wheeler, the attorney for the plaintiff; and Mr. Leo E. Costello, the attorney for the debtor, appeared. The matters were submitted on the testimonies of

## II. FACTS

### A. The Operation

The debtor operated a used car dealership under the trade name "Distinctive Motor Cars." Cars purchased with funds advanced by the plaintiff and other non-institutional lenders, were placed for sale on a lot leased and maintained by the debtor.

As between the plaintiff and the debtor, from September 1992 through the middle of 1994, the parties operated under a contract regarding the purchase and sale of used automobiles. Pursuant to that contract, the plaintiff advanced funds to the debtor for use by the debtor for the wholesale purchase of used automobiles. After the purchase of an automobile, the debtor was required under the contract to deliver the automobile's title to the plaintiff. The debtor would then attempt to resell the automobile for a profit. When the debtor sold an automobile, he was required to reimburse the plaintiff, from the

---

1. Admitted into evidence were the debtor's answer to the plaintiff's complaint; HOC, Inc.'s ledger sheet showing transactions with Mr. McAllister; the discovery deposition of Mr. McAllister; a written agreement between HOC and Mr. McAllister; the transcript of Mr. McAllister's 341 meeting of creditors held on July 20, 1995; a copy of Mr. McAllister's bankruptcy petition; a copy of HOC's discovery request entitled "Discovery Document Number Two"; Mr. McAllister's response to HOC's "Discovery Document Number Two"; several items of correspondence between the attorneys for the parties regarding discovery; a number of checks made to Distinctive Motor Cars, Mr. McAllister's sole proprietorship; and numerous checks made to HOC.

sale proceeds, the amount advanced by the plaintiff for the wholesale purchase of the automobile. On reimbursement by the debtor from the proceeds of the sale of an automobile, the plaintiff was required to deliver the automobile's title to the debtor who, in turn, was to deliver the title to the retail purchaser.

Specifically, the debtor would purchase a car at wholesale, usually from an automobile auction and would pay for the car with a check drawn on his Distinctive Motor Cars account. The debtor would in turn receive from the seller of the automobile either the title to the automobile or a bill of sale pending transfer of the title. The debtor would then deliver to the plaintiff either the title, or, if the debtor had not received the title, the bill of sale from the auction company with a promise to the plaintiff to deliver the title once received from the auction company. The plaintiff would then provide funds to the debtor in an amount sufficient to cover the Distinctive Motor Cars check given by the debtor to the seller for the car. Upon his sale of the automobile, the debtor would give the plaintiff a portion of the sale proceeds equal to the amount advanced by the plaintiff to the debtor for the purchase of the automobile. Any amount received by the debtor from the purchaser over and above the amount advanced by HOC was retained by the debtor as his "profit." Upon receipt of its share of the proceeds from the debtor, the plaintiff would deliver the title to the car back to the debtor, who would then transfer the title to the purchaser. Of course, if the debtor sold the car before delivering the title to the plaintiff, he would deliver the title, upon receipt of the same, directly to the purchaser of the automobile rather than the plaintiff.

The plaintiff and debtor did not necessarily "settle up" with one another on a daily or per car basis. Mr. Gould, the plaintiff's representative periodically met with Mr. McAllister to reconcile any outstanding transactions by exchanging checks and car titles. Mr. McAllister would, at a typical meeting, give Mr. Gould either the titles or bills of sale with promise of titles, to any cars that he had purchased since their last meeting. In return, Mr. Gould would give Mr. McAllister a check from HOC for the amount paid to the auction company or other seller for the automobiles, an amount calculated by Mr. Gould from the bills of sale received by Mr. McAllister from the auction company or other seller. These typical meetings also allowed Mr. McAllister an opportunity to give Mr. Gould a Distinctive Motor Cars' check from the proceeds of the cars that had been sold by him since the last meeting.

Under the parties' contract, the debtor was required to pay a specified sum each month to the plaintiff in lieu of interest on the unpaid principle balance of cumulative unreimbursed funds advanced to the debtor. Over the course of their dealings, the unpaid principle balance of funds advanced to the debtor was as high as $150,000 and the monthly payment required of the debtor ranged from a low of $3,600 to a high of $4,800. This monthly payment was, however, the only profit or return on investment that HOC was to receive under the agreement with Mr. McAllister.

The arrangement between the plaintiff and the debtor worked without problems until December 1993. According to Mr. Gould's records, from September 1992 until December 26, 1993, Mr. McAllister sold 127 cars that had been purchased with funds advanced by HOC, and turned over to HOC the $930,372 in proceeds due from those sales under the terms of the contract. After December 26, 1993, Mr. McAllister sold 19 cars that had been purchased with funds advanced by HOC, but only turned over the proceeds due under the contract from 13 of those sales, an amount totaling $82,620. HOC was due, under the contract an additional $89,470 from the other six car sales that occurred after December 26, 1993.

Until January 1, 1994, the contract between the debtor and the plaintiff was oral. On that date, the debtor, at the plaintiff's behest, signed a document which purported to embody the terms of the oral contract and

which granted the plaintiff security interests in the automobiles purchased by the debtor from funds advanced by the plaintiff.

As for the money the debtor failed to pay to HOC, Mr. McAllister testified that he used the funds to cover insufficient funds checks written to others.

### B. The Unreimbursed Automobiles

The controversy in this case centers around the above-described six automobiles sold after December 23, 1993.[2] Each of these automobiles was purchased by the debtor with funds advanced by the plaintiff. The plaintiff alleges that the automobiles were sold by the debtor to third parties but that the debtor did not reimburse the plaintiff for the funds advanced for the purchases, as required by the contract. The debtor freely admits that he sold the automobiles and that he did not reimburse the plaintiff from the proceeds of the sales. The debtor also admits that he did not deliver the titles to four of the six automobiles to the plaintiff when he purchased the cars at wholesale.

Five of the six cars in question were sold by the debtor after January 1, 1994, the date the written memorandum was signed by the debtor. Two of those five cars were purchased by the debtor from funds advanced by the plaintiff after that date. A description of, and the evidence regarding, each automobile is discussed below.

1. 1970 Oldsmobile 442—HOC advanced $9,500 to the debtor to cover the purchase of the Oldsmobile on September 10, 1992. The debtor sold the Oldsmobile on February 11, 1994 for $9,000. The debtor did not inform the plaintiff that the car had been sold. He did not obtain the bill of sale from the plaintiff before he transferred the vehicle (the automobile was not, because of its date of manufacture, a "titled" vehicle) and did not reimburse the plaintiff from the proceeds.[3]

2. 1978 Mercedes Roadster—HOC advanced $10,500 to the debtor to cover the purchase of the Mercedes on November 4, 1993. The debtor sold the Mercedes on June 13, 1994 for approximately $9,000. The debtor did not inform the plaintiff that he had sold the car. He did not obtain the certificate of title to the car from the plaintiff before transferring the vehicle to the customer and did not reimburse the plaintiff from the proceeds.

3. 1991 BMW 325i—The debtor purchased the BMW at an automobile auction. HOC advanced $14,000 to the debtor to cover

---

**2.** Originally, the action before this Court involved eight automobiles. However, at trial, Mr. McAllister presented uncontroverted evidence that he had actually reimbursed HOC for two of the automobiles originally in issue, one Subaru and one Volkswagen. HOC conceded at trial that the Subaru and the Volkswagen were no longer subjects of this adversary proceeding. For a discussion of these automobiles see this Court's Order of September 17, 1996 regarding the debtor's *Motion for Summary Judgment.*

**3.** Under Alabama law, all motor vehicles manufactured after 1974 must have a certificate of title. Code of Ala.1975, § 32–8–30(a). According to HOC's ledger, only two of the 146 cars purchased by the debtor with funds advanced by HOC over the course of their relationship were non-titled vehicles, the Oldsmobile, which was purchased with the very first funds advanced by HOC to the debtor, and the 1971 Mercedes 280 SL which was purchased by the debtor on February 12, 1993. The written agreement between the parties, in paragraph 5, specifies that "John McAllister agrees that he will not buy automo-

biles without Certificates of Title (no Bills of Sale)...." Recognition of these two purchases is important as these purchases are related to the debtor's argument that since the debtor was permitted to purchase two non-titled vehicles prior to the execution of the written agreement, that the written agreement this Court recognizes as binding the debtor to pay certain nondischargeable debts, really does not reflect the manner in which the parties were doing business prior to the writing. This argument is important because if accepted, the debt for the money advanced by the plaintiff to the debtor before the written contract may have been dischargeable. However, this Court does not accept the argument. A two-car deviation from the norm is not sufficient to rebut the other overwhelming evidence that indicates that the written agreement reflects the manner in which the parties had been doing business prior to the writing. There is also no reason that the parties could not, in the written agreement, clarify their arrangement to avoid future problems.

the purchase of the BMW on December 15, 1993. When the debtor received the title to the BMW from the auction he did not deliver that title to the plaintiff as required by the contract. The debtor sold the BMW for $15,000 on December 27, 1993 and delivered the title directly to the purchaser. He did not inform the plaintiff that the car had been sold and did not reimburse the plaintiff from the proceeds.

4. 1992 Crown Victoria LX—The debtor purchased the Crown Victoria at an automobile auction. HOC advanced $13,000 to the debtor to cover the purchase of the Ford on December 15, 1993. When the debtor received the title to the Crown Victoria from the auction he did not deliver that title to the plaintiff as required by the contract. The debtor sold the Crown Victoria on February 23, 1994 for $12,450 and delivered the title directly to the purchaser. He did not inform the plaintiff that the car had been sold and did not reimburse the plaintiff from the proceeds.

5. 1993 Cadillac DeVille—The debtor purchased the Cadillac at an automobile auction. HOC advanced $22,235 to the debtor to cover the purchase of that automobile on January 12, 1994. When the debtor received the title to the Cadillac from the auction he did not deliver that title to the plaintiff as required by the contract. The debtor sold the vehicle on February 23, 1994 for $21,200 and delivered the title directly to the purchaser. He did not inform the plaintiff that the car had been sold and did not reimburse the plaintiff from the proceeds.

6. 1990 Jaguar XKS—The debtor purchased the Jaguar at an automobile auction. HOC advanced $20,235 to the debtor to cover the purchase of that automobile on January 12, 1994. When the debtor received the title to the Jaguar from the auction he did not deliver that title to the plaintiff as required by the contract. The debtor sold the Jaguar for $20,000 on March 10, 1994 and delivered the title directly to the purchaser. He did not inform the plaintiff that the car had been

sold and did not reimburse the plaintiff from the proceeds.

## III. CONCLUSIONS OF LAW

### A. Issue No. 1—Dischargeability of Debts

#### 1. Willful and Malicious Conversion— § 523(a)(6)

The determination of willful and malicious conversion associated with the sale of automobiles by a dealer financed by a secured creditor, initially has two parts. First, did the dealer act in a willful and malicious manner. Second, did the secured creditor acquiesce in those actions.

#### a. Knowledge of Harm and Lack of Good Faith; *Ford Motor Credit v. Owens,* 807 F.2d 1556 (11th Cir.1987)

The plaintiff contends that the debtor's failure to deliver titles to the plaintiff and failure to reimburse the plaintiff from sales proceeds as required by the contract, constitutes the willful and malicious conversion of its interests in the automobiles sold and the proceeds of those automobiles, and that the debt created by these failures is a nondischargeable debt pursuant to 11 U.S.C. § 523(a)(6).

The general rule of law in these matters is that a car dealer who obtains cars with money advanced by a secured creditor and disposes of the cars without remitting the proceeds of the car sales to the secured creditor in contravention of a floor plan security agreement may be guilty of a willful and malicious conversion of the secured creditor's interest in the cars. *Ford Motor Credit Co. v. Owens,* 807 F.2d 1556, 1559 (11th Cir. 1987). *See also Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1264 (11th Cir.1988). In applying this rule, "malice ... can be established by a finding of implied or constructive malice." *Chrysler Credit Corp. v. Rebhan,* 842 F.2d at 1263.[4] In addition, malice is inferred if the dealer had no good faith

---

4. "Constructive malice" is "malice which is not

shown by direct proof of an intention to do injury

reason for disposing of the sales proceeds and necessarily knew that harm would result to the creditor from the failure to remit. *Ford Motor Credit Co. v. Owens*, 807 F.2d at 1559.

█ In this case, Mr. McAllister had no good faith reason for not remitting the proceeds from the sales of the six cars in question.[5] He did not use the proceeds from the sale of the cars in an effort to save Distinctive Motors Cars. Instead, according to his testimony, Mr. McAllister placed the funds in his general operating account to cover outstanding checks that he had previously written to purchase other cars. Mr. McAllister knew that by placing the funds in his account and using them to cover outstanding checks, HOC would be deprived of those funds.

Furthermore, little weight should be given to Mr. McAllister's assertion that he sincerely intended, at the time he converted the car sale proceeds, to repay HOC. Mr. McAllister offered no evidence of a source, other than Distinctive Motor Cars, from which he might have derived income to pay HOC. According to Mr. McAllister's own testimony, Distinctive Motor Cars was, at the time he sold most of the cars in February and March, 1994, out of business, and his efforts were, at that time, directed toward liquidating the remaining cars on his lot and reconciling, to the extent he could, with his lenders.

When he sold the cars, Mr. McAllister owed substantial sums not only to HOC, but to other non-institutional lenders. In the schedule of creditors filed with his bankruptcy petition, Mr. McAllister lists a debt to one of those lenders, Mr. William H. Taylor, for $197,785.00. This Court must conclude that Mr. McAllister could not have had a reasonable expectation of repaying the funds owed to HOC.

Mr. McAllister simply made a conscious decision in order to cover insufficient funds checks, to deprive HOC of proceeds it was entitled to under the agreement.[6] This self-serving decision to pay one creditor rather than HOC satisfies both the willful and malicious requirements of section 523(a)(6).

**b. No Waiver of Nondischargeability; *Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52 (11th Cir.1995)**

█ In deciding whether the debtor's willful and malicious action should prevent the discharge of some of his debts, this Court must decide whether HOC waived its security interest. The Court of Appeals for the Eleventh Circuit instructs that an inference of malice may be rebutted if the course of dealing between parties shows that a secured

(express malice), but which is inferentially established by the necessarily injurious results of the acts shown to have been committed." *Black's Law Dictionary* 957 (6th ed.1990). "Implied malice" is "[m]alice inferred from any deliberate cruel act committed by one person against another, however sudden." *Id.*

5. Unlike the agreements involved in *Owens* and *Rebhan*, the agreement in this case did not require the debtor to place the proceeds from the sales of the collateral in a special trust account. However, the written agreement between the plaintiff and debtor, like the agreements in those cases, contemplated that the proceeds from the sales would be used to reimburse the plaintiff and not be used for other purposes. "At the time of the sale, John McAllister agrees to notify HOC, Inc., from the sales proceeds, the amount of the advanced funds that shall be paid to HOC, Inc." Plaintiff's Exhibit # 2. Also, that was, according to the testimony presented, how the agreement operated prior to execution of the writing. The agreement was designed so that HOC would basically be subject to no risk of non-reimburse-

ment for the monies advanced to purchase the automobiles.

6. Mr. McAllister testified that he used the funds to cover some insufficient funds checks; however, Mr. McAllister offered no documents, testimony or other evidence that he deposited the money in his business account or used the money to cover checks for other car purchases. This failure to offer additional proof to support his assertions, despite the fact that he has access to or possession of the books and records of the business by which his otherwise unsupported testimony could have been substantially proved, undermines the credibility of his testimony. As the court in *Rebhan* recognized, "The [debtor's] failure to provide such evidence must be given some weight because the financial books and records by which the legitimacy of the transactions could be proved, were in the possession of the dealership and the [debtor]." *Chrysler Credit Corp. v. Rebhan*, 842 F.2d at 1263 (parenthetical added).

creditor "knowingly acquiesced in the [debtor's] business practices and took no steps to protect its collateral." *Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52, 54 (11th Cir.1995) (parenthetical added). In other words, if a secured creditor acquired knowledge of the dealer's conversion at a point in time when "it could have asserted its security interest in the property and failed to take reasonable steps to protect its security, the indebtedness should be discharged." *Id.* at 54 (quoting *Bennett v. W.T. Grant Co.*, 481 F.2d 664, 666 (4th Cir.1973)).

■ At this proceeding, the debtor did not present any evidence to demonstrate that Mr. Gould or HOC knew or should have known that Mr. McAllister would wrongly retain the proceeds of the six automobiles or that HOC in any sense acquiesced in or consented to his doing so. In fact, Mr. McAllister had, prior to his initial defalcation in December 1993, faithfully abided by his promise to turn over sale proceeds. HOC, therefore, had every reason to expect that Mr. McAllister would turn over the sales proceeds from the six cars in question and in contrast, HOC had no reason to suspect that this would not be done. Mr. McAllister sold other cars and remitted the proceeds from those sales to HOC during January and February 1994, the same general time period that he sold most of the cars in question. This provided HOC with ample reason not to suspect that its collateral was in danger. Unlike the secured creditor in *Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52, 54 (11th Cir.1995), HOC cannot reasonably be said to have waived its right to assert the nondischargeability of its debt under 11 U.S.C. § 523(a)(6). HOC made its last advance to Mr. McAllister on January 12, 1994, before all except one of the six cars in question were sold. There is no evidence that HOC then knew about the one car that

had been sold "out-of-trust" by the debtor prior to that date, or knew that Distinctive Motor Cars was in financial distress when the last advance was made.

### c. The Validity of the Security Agreement

But, even if the debtor acted in a recognizable willful and malicious manner, those actions do not necessarily make all of his debts to HOC nondischargeable. This Court must look further. Clearly, based on the decisions of the Court of Appeals for the Eleventh Circuit in *Owens* and *Rebhan,* if the debtor had a legally enforceable obligation under a valid security agreement to remit the proceeds of the six cars in question to HOC, his failure to do so constitutes a willful and malicious injury to HOC's property. But the debtor contends that because the agreement between the debtor and plaintiff was *oral* rather than in *writing,* and because a *writing* is required by Ala.Code 1975, § 7–9–203(1)(a), that the plaintiff had no valid security interest in either the automobiles or their proceeds and that no interest in either the automobiles or their proceeds could have been converted by the debtor.[7] This Court agrees with the debtor that if the parties' written contract does not capture the sales of the affected cars, the debts resulting from those sales are nondischargeable. This Court finds however, that the written contract does capture the majority of the sales.

### (1) The Applicable Statute; Ala.Code 1975, § 7–9–203(1)(a)

■ Section 7–9–203(1)(a) of the Alabama Code provides that a security interest is not enforceable *against a debtor* or third parties with respect to collateral unless "the debtor has signed a security agreement which contains a description of the collateral...." Ala.Code 1975, § 7–9–203(1)(a).[8] The often

---

7. The parties' positions on this question are discussed in detail in this Court's order of September 17, 1996 regarding the debtor's *Motion for Summary Judgment.*

8. The issue regarding the security interest in this case should not be confused with the issues in

cases which involve security interests which, although valid as between the debtors and their secured creditors, are unperfected and therefore invalid against third parties. Generally speaking, a security agreement which is valid between a debtor and a secured creditor is sufficient to

quoted "Official Comments" to that code section explain that the section is in the nature of a statute of frauds, so that an oral security agreement ordinarily accords the secured party no right to take possession of collateral or have the collateral sold to satisfy the debt. Those comments read:

> The formal requisite of a writing stated in this section is not only a condition to the enforceability of a security interest against third parties, it is in the nature of a Statute of Frauds. Unless the secured party is in possession of the collateral, his security interest, absent a writing, which satisfies paragraph (1)(a), is not enforceable even against the debtor, and cannot be made so on any theory of equitable mortgage or the like. If he has advanced money, he is of course a creditor and, like any creditor, is entitled after judgment to appropriate process to enforce his claim against his debtor's assets; he will not, however, have against his debtor the rights given a secured party by Part 5 of this Article on default.

Official Comments to Ala.Code 1975, § 7–9–203(1)(a), paragraph 5.

### (2) The Written Agreement

 The agreement signed by the debtor on January 1, 1994, satisfies the requirements of Ala.Code 1975, § 7–9–203(1)(a). The document explicitly uses the term "security agreement" with respect to any automobiles purchased by the debtor with funds advanced by the plaintiff and gives the plaintiff rights to inspect the automobiles and to take possession and sell the automobiles to satisfy debts owed under the contract in the event of the debtor's default. The use of generic terms "automobiles" and "vehicles" (coupled with language which clearly indicates that the "automobiles" and "vehicles" referred to are those purchased by the debtor with funds advanced by the plaintiff) meets the "description of the collateral" requirement of 7–9–203(1)(a) and was sufficient to create a security interest in any particular car purchased by the debtor with the plaintiff's money.[9] The debtor's contention that the written agreement does not impact the transactions that began prior to the writing is discussed below in relation to those particular transactions.

### d. The Automobiles

This Court has determined that the debtor's actions were willful and malicious and that the parties' written contract applies. To determine the effect of those determinations

create a property interest that may be the subject of either embezzlement under 11 U.S.C. § 523(a)(4), or willful and malicious injury under 11 U.S.C. § 523(a)(6), even though the security interest created by the agreement is unperfected as to third parties. *See General Motors Acceptance Corp. v. Dotson,* 155 B.R. 389, 390 (W.D.Va.1993); *Allied Credit Corp. of Tennessee v. Giffen (In re Giffen),* 195 B.R. 951, 953 (Bankr. M.D.Fla.1996); *Mercury Fin. Co. of Georgia v. Muto (In re Muto),* 124 B.R. 610, 612 (Bankr. M.D.Fla.1991); *Hardwick v. Petsch (In re Petsch),* 82 B.R. 605, 607 (Bankr.M.D.Fla.1988); *Dominion Nat'l Bank of Richmond v. Gantt (In re Gantt),* 56 B.R. 852, 857 (Bankr.E.D.Va.1985).

9. *Coseo v. Alpena Savings Bank,* 612 F.2d 276, 277 (6th Cir.1980) (description of collateral in security agreement between bank and automobile dealer as "all inventory financed through these transactions," was sufficient to create security interest in individual vehicles); *Chicago Limousine Serv., Inc. v. Hartigan Cadillac, Inc.,* 191 Ill.App.3d 886, 139 Ill.Dec. 1, 6, 548 N.E.2d 386, 391 (1989) (words in security agreement relating to new and used vehicles held for sale or lease, "all vehicles of like kinds or types now owned or hereafter acquired," and "all additions and accessions thereto and all proceeds of such vehicles," adequately described automobile inventory financed by secured party), *rev'd on other grounds,* 139 Ill.2d 216, 151 Ill.Dec. 342, 564 N.E.2d 797 (1990); *Villa v. Alvarado State Bank,* 611 S.W.2d 483 (Tex.Civ.App.1981) (description of collateral in security agreement as "All motor vehicles purchased from time to time by Debtor with proceeds of funds advanced by Bank. Such vehicles shall be inventory in hands of Debtor." was sufficient to create security interest in any particular "motor vehicle" acquired or "purchased" by the debtor).

A description of personal property in a security agreement is sufficient "whether or not it is specific if it reasonably identifies what is described." Ala.Code 1975, § 7–9–110. *See Galleon Industries, Inc. v. Lewyn Machinery Co.,* 50 Ala.App. 334, 279 So.2d 137, 141 (1973) (description of collateral in security agreement as "equipment" was sufficient to create security interest in individual machine), *cert. den.,* 291 Ala. 779, 279 So.2d 142 (1973).

on the debts before this Court, specific consideration must be given to the six automobiles involved. Those automobiles may be grouped into three categories.

### (1) Cars *Purchased After* and *Sold After* January 1, 1994: The Cadillac and Jaguar

■ According to HOC's ledger, the ledger on which Mr. Gould recorded HOC's transactions with Mr. McAllister, only the Jaguar and the Cadillac were purchased from *funds advanced* by HOC *after January 1, 1994.* Since a valid written security agreement was signed by the debtor on January 1, 1994, the issue of the enforceability of the oral agreement between the parties is not germane to the Cadillac and the Jaguar. Therefore, judgment must be granted for the plaintiff as to the unremitted proceeds that Mr. McAllister received for the Cadillac and Jaguar.

### (2) Cars *Purchased Before* January 1, 1994 and *Sold After* January 1, 1994: The Mercedes, Oldsmobile and Crown Victoria

■ Judgment must also be granted to the extent that the plaintiff's complaint is based on the debtor's *sale, after January 1, 1994,* of automobiles purchased by the debtor with *funds advanced* by the plaintiff *before January 1, 1994* because the parties' *written* agreement encompasses those automobiles. Under the applicable portions of Ala.Code 1975, § 7–9–203(1), a security agreement is enforceable if (a) the debtor has signed a written security agreement, and (b) value has been given by the secured party for the security interest and the debtor has acquired rights in the collateral. Section 7–1–201(44)(b) of the Alabama Code provides that a person gives "value" for rights if he or she acquires them "[a]s security for or in total or partial satisfaction of a preexisting claim." *Mr. McAllister was, therefore, free to grant a valid security interest on January 1, 1994 to secure advances made by the plaintiff before that date.* If the January 1, 1994 agreement was intended, in part, to accomplish that purpose, then the writing requirement of 7–9–203(1)(a) has been satisfied. This Court finds that there was such intent.

Both the language of the security agreement and the debtor's deposition testimony indicate that the agreement was intended not only to govern future business relations between the parties, but was also to affirm and memorialize the agreement between the parties as to automobiles then in the debtor's possession. The agreement was prepared by the plaintiff in the form of a letter to the debtor. In the first sentence, the agreement is referred to as an "Agreement with [the debtor] in writing pertaining to the *pending operation* involving the financing of automobiles for [the debtor]." The terms of the document are identical to the oral agreement between the parties (notwithstanding the debtor's contention otherwise) and mirror the manner in which business had been conducted between the parties up until the time the agreement was executed as well as the manner in which business was being conducted between the parties at the time the agreement was executed. See note 3 above. Mr. Gould's testimony at trial indicates that the purpose of the writing was to confirm the manner in which the parties had been doing business and govern the arrangement between the parties as it then stood. Mr. McAllister, in his trial testimony, did not dispute or attempt to refute Mr. Gould's testimony on that point. In his deposition, the debtor identified the written agreement, and was asked the following question: "And at the time that you transferred these cars did you have knowledge or did you understand and recognize the terms and conditions of your agreement with [the plaintiff]?" The phrase "these cars" was used generally to describe all six of the cars that the debtor admits to selling without reimbursing the plaintiff. In response to the question, the debtor answered "Yes," without distinguishing between the automobiles purchased before the agreement was signed and those purchased after the agreement was signed. Similarly, the debtor did not suggest that automobiles purchased before he signed the agreement were not intended to be covered by the agreement or that the agreement was only intended to cover automobiles subsequently purchased by him with the plaintiff's

money. The debtor's contention that the written agreement did not reflect the oral agreement, and was a new method of operations, must be rejected.

### (3) Cars *Purchased Before* January 1, 1994 and *Sold Before* January 1, 1994: The BMW

 Judgment must be *denied* as to the 1991 BMW 325i which was *sold by the debtor before January 1, 1994.* The BMW was sold by the debtor on or around December 27, 1993, five days before the debtor signed the written security agreement. Since the oral security agreement between the parties did not become enforceable until

January 1, 1994, the date the agreement was put into writing, Mr. McAllister was not, prior to that date, under any legally enforceable obligation to remit the proceeds of the BMW to HOC. His failure to remit those proceeds, therefore, was neither a conversion or willful and malicious injury to any property in which HOC had a legally enforceable interest.[10]

### 2. Fraud and Embezzlement- § 523(a)(2)(A) and § 523(a)(4)

The plaintiff also contends that the debts created by the debtor's failure to reimburse

---

**10.** This result is required even though the written agreement, once executed, may have created an enforceable security interest in the BMW and its proceeds. While section 7–9–203(1)(a) requires a security agreement to be in writing, it does not specify when the writing must be executed. When an issue is not specifically addressed by a provision of the Uniform Commercial Code, Section 7–1–103 of the Alabama Code contemplates that the issue will be decided in accordance with principles of common law and equity. "Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating and invalidating cause shall supplement its provisions." Ala.Code 1975, § 7–1–103. Under the common law of this state, as well as many other states, a writing signed subsequent to an oral agreement, which memorializes the terms of the oral agreement, satisfies the Statute of Frauds. *Weitnauer Trading Co., Ltd. v. Annis,* 516 F.2d 878, 880 (2nd Cir.1975) (interpreting New York law); *Busler v. D. & H. Manufacturing, Inc.,* 81 Ohio App.3d 385, 611 N.E.2d 352, 355 (1992); *Lonnie Hayes & Sons Staves, Inc. v. Bourbon Cooperage Co.,* 777 S.W.2d 940, 942 (Ky.App.1989); *Joiner v. Elrod,* 716 S.W.2d 606, 609 (Tex.App.1986); *Johnson v. Ogle,* 120 Mont. 176, 181 P.2d 789, 791 (1947); *Gordon v. Beck & Gregg Hardware Co.,* 74 Ga.App. 566, 40 S.E.2d 428, 432 (1946). "A memorandum sufficient to satisfy the Statute may be made or signed at any time before or after the formation of the contract." *Restatement (Second) of Contracts* § 136 (1981).

"The object of the statute of frauds is to protect individuals from having parol agreements imposed on them against their consent; but it has been uniformly held not to defeat a parol contract which is afterwards evidenced by a writing signed by the party sought to be charged with it." *Levy v. Allen,* 257 Ala. 326, 331, 58 So.2d 617, 622 (1951). The purpose of the statute of frauds is evidentiary. *Id.* All contracts are essentially

oral; the writing is only a memorial of the oral contract designed to prevent future dispute regarding what was agreed upon. Therefore, a writing signed by a party subsequent to entering into a oral contract which acknowledges the existence and terms of the oral contract, is equally sufficient to prove the existence and terms of the contract as is a writing signed contemporaneously with the oral contract. As stated by the Alabama Supreme Court:

"The object of the statute of frauds is to protect individuals from having parol agreements imposed on them against their consent; but it has been uniformly held not to defeat a parol contract which is afterwards evidenced by a writing signed by the party sought to be charged with it." It was said in *Jenkins v. Harrison,* [66 Ala. 345 (1880)] *supra:* The purpose and object of the statute being no more than the requisition of written evidence of the substance of the contract, signed by the party to be charged, so that he may not be subjected to the mischief which could follow from mere oral evidence; the purpose and object, and the words of the statute, are all satisfied, whenever there exists, under the hand of the party sought to be charged, a written statement, containing, either expressly, or by necessary inference, all the terms of the agreement—that is to say, the names of the parties, the subject-matter of the contract, the consideration, and the promise, and leaving nothing open to future treaty. This, therefore, is sufficient to satisfy the statute; and provided this be found, no formality is required; nor does it signify at all what is the nature or character of the document containing such written statement—whether it be a letter written by the party to be charged to the person with whom he contracted, or to any other person, or a deed, or other legal instrument, or an answer to a bill, or an affidavit in chancery, in bankruptcy, or in lunacy.

After a contract has passed beyond negotiation or treaty—after the minds of the parties have met—after there has been reciprocal assent to all its terms—unless all the negotiations

the plaintiff constitutes fraud or embezzlement or both and that under 11 U.S.C. § 523(a)(2)(A) or 11 U.S.C. § 523(a)(4) or both, are nondischargeable. This Court need not address all of these arguments as the Court has determined that the debts owed to the plaintiff, other than the debt for the BMW, are nondischargeable under 11 U.S.C. § 523(a)(6). And as that issue relates to the BMW, the Court agrees with the debtor.

▆▆▆ The debt owed for the BMW is not a fraud exception under 11 U.S.C. § 523(a)(2)(A). The plaintiff has offered no evidence of any explicit misrepresentations made by the debtor on the occasion that he received the funds from Mr. Gould for the purchase of the BMW. Also, no evidence was presented by the plaintiff that the debtor, when he received the funds from Mr. Gould to purchase the BMW, did not intend to use the proceeds from the BMW to reimburse HOC. Indeed, the fact that Mr. McAllister repaid HOC for 140 cars, many of which were financed by HOC during the same period of time as the BMW, militates against an inference that, on the occasion that he received the money to purchase the BMW, Mr. McAllister had the specific intent not to repay the money advanced to purchase the BMW from the sales proceeds that he ultimately received for that car.

have been conducted in writing, there is, of necessity, a period of time, longer or shorter, when it rests wholly in parol—the period intervening between the conclusion of treaty, the mutual assent of the parties, and the reduction of the terms of the contract to writing. The writing is not the contract—it is no more or less than the evidence of it, which must exist, or the contract is without legal validity or efficiency, and this evidence may be supplied at any time after the contract is completed. *Levy v. Allen,* 257 Ala. at 331–332, 58 So.2d at 622 (citations and internal quotation marks omitted).

Likewise, the avowed purpose of the writing requirement of 7–9–203(1)(a) is "evidentiary." Official Comments to Ala.Code 1975, § 7–9–203(1)(a), paragraph 3. "The requirement of written record minimizes the possibility of future dispute as to the terms of a security agreement and as to what property stands as collateral for the obligation secured." *Id.* Therefore, a written security agreement signed subsequent to creating an oral security agreement, which embodies the terms of the oral security agreement, fully serves the evidentiary purpose of 7–9–203(1)(a) and

▆▆▆ The debt owed for the BMW is also not an embezzlement exception under 11 U.S.C. § 523(a)(4). Embezzlement, under section 523(a)(4), is the fraudulent appropriation of property belonging to another by a debtor who was entrusted with the property or into whose hands the property has lawfully come.[11] Embezzlement, like conversion, requires that the offended party have a property interest in the property embezzled. HOC did not own the BMW or its proceeds, or, absent an enforceable security agreement, even have a property interest in those proceeds, but merely had a contractual right to receive them. The debtor's failure to fulfill his contractual commitment to remit the BMW proceeds, while a breach of contract, did not constitute embezzlement.

### B. Issue No. 2—Discharge Under Section 727

A debtor is entitled to a discharge under the Bankruptcy Code unless certain events occur. The event alleged in this proceeding is that the debtor made a false oath or account in his bankruptcy petition, an action, if occurring as alleged would prevent the debtor's discharge. See 11 U.S.C. § 727(a)(4)(A).

▆▆▆ In its *Amended Complaint,* the plaintiff contends that the response made by

avoids the evils sought to be avoided by that statute. Accordingly, the bare assertion by the debtor that, when the BMW was sold, the parties were operating pursuant to an oral security agreement does not preclude a finding that, as to the BMW, the January 1, 1994 contract satisfies the writing requirement of 7–9–203(1)(a). However, the debtor's act of failing to remit the proceeds of the car cannot ex post facto be made tortuous by his subsequent execution of the written document, and, since that act, when accomplished, did no willful and malicious injury to a legally enforceable property right of HOC, it forms no basis for denying the dischargeability of the resulting debt in this bankruptcy case. The debtor argues that this Court should reach this result as to all six of the automobiles, but this Court disagrees.

**11.** *Brady v. McAllister (In re Brady),* 101 F.3d 1165, 1173 (6th Cir.1996); *Belfry v. Cardozo (In re Belfry),* 862 F.2d 661, 662 (8th Cir.1988); *Pierce v. Pyritz,* 200 B.R. 203, 205 (N.D.Ill.1996); *Skemp v. Michel (In re Michel),* 74 B.R. 88, 90 (N.D.Ohio 1986).

the debtor to Question 11 in his bankruptcy petition statement of affairs was false and that as a consequence, the debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4)(A). Question 11 of the statement of affairs asks the debtor to "List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case." In response to Question 11 the debtor marked the block which says "None" with an "X." The plaintiff contends that the response is false in that it "fail[s] to disclose the closed financial account ...," *Amended Complaint,* Paragraph 18.

HOC has presented no evidence that Mr. McAllister closed any financial accounts within the year preceding bankruptcy. The debtor's deposition, taken November 27, 1995, contains only the following brief reference to bank accounts. It reads:

Q. Did you have a checking account—

A. Yes.

Q.—on Distinctive Motors? Do you still have a checking account?

A. No.

Q. Where was the checking account?

A. First Commercial.

Q. Did you have it for the last two years before you filed your bankruptcy petition?

A. Yes.

Copy of Deposition of John R. McAllister, pages 11–12, Plaintiff's Exhibit 5. The debtor's deposition testimony merely established that the First Commercial Bank account was closed at some point prior to November 27, 1995, the date the deposition was taken.

At the debtor's first meeting of creditors, the debtor was also questioned briefly about his bank accounts and gave the following testimony on the subject. He stated:

Q. What banks did you deal with?

A. I banked with Compass Bank and First Commercial Bank.

Q. And what were those account names? What was the names of the account?

A. Distinctive Motor Cars.

Q. On both accounts?

A. Uh-huh. And I had a personal checking account, John R. McAllister. And we had P.J.'s Pawn account at New Federal Savings and that was it.

Copy of Transcript of 341 Hearing, pages 15–16, Plaintiff's Exhibit 4.

As is apparent from the quoted excerpts, the debtor did not testify in either his deposition or at his section 341 meeting of creditors that he closed any bank accounts within the year preceding bankruptcy. At trial, upon examination by HOC's attorney, Mr. McAllister testified that he had an account at Compass Bank and had personal and business accounts at First Commercial Bank, but could not recall precisely when any of those accounts were closed. When examined by his own attorney, Mr. McAllister testified that he probably closed the account at First Commercial Bank, the primary account through which his Distinctive Motor Cars business was conducted, around the same time that he shut down the business, which was in March 1994. He could not recall when the account at Compass Bank was closed. On Schedule B attached to his bankruptcy petition, the schedule of personal property, Mr. McAllister indicates clearly that he owned no bank accounts when the petition was filed.[12] When, prior to bankruptcy, the First Commercial Bank and Compass accounts were closed is, of course, the relevant inquiry.

---

12. The debtor was asked to agree that the accounts were possibly open when the bankruptcy case was filed (as opposed to being closed during the year preceding bankruptcy). If the debtor had agreed, he would have contradicted the information in his Schedule B, which indicates that he owned no accounts when the case was filed. This Court has, however, carefully reviewed Mr. McAllisters' responses to the questions to determine whether the debtor agreed that the accounts were open when the case was filed, but has found no such agreement.

■ The last check written to HOC on the First Commercial Bank account, among the checks that were entered into evidence, is dated February 10, 1994. The last check, among the checks admitted into evidence, that was written to HOC on the Compass Bank account is dated May 20, 1994. According to the evidence, the First Commercial Bank account was closed after February 10, 1994 and the Compass Bank account was closed after May 20, 1994. However, the question of whether either account was closed prior to June 14, 1994, within the year preceding bankruptcy, remains unanswered by any of the testimony or evidence present-

ed in this cause by either party.[13] The evidence is inconclusive and does not establish that Mr. McAllister closed any bank accounts within the year preceding bankruptcy. Since HOC has failed to prove by a preponderance of the evidence that Mr. McAllister falsely answered Question 11 on his statement of affairs, HOC's objection to Mr. McAllister's discharge under 11 U.S.C. § 727(a)(4)(A) must be denied.[14]

## IV. CONCLUSION

■ Based on the above, this Court concludes that the plaintiff proved by a pre-

13. The attorney for the plaintiff, over the course of the trial, asked this Court to make inferences from the purported failure of Mr. McAllister to completely and candidly respond to discovery requests. To that end, the plaintiff elicited and obtained the admission into evidence of Plaintiff's Exhibits numbered 7, 8 and 9. Plaintiff's Exhibit 7 is HOC's discovery request entitled "Discovery Document Number Two" as well as the debtor's response to that request, which contains numerous objections. Plaintiff's Exhibit 8 is a letter from the plaintiff's attorney to the debtor's attorney, basically chastising him for the nature of his responses to "Discovery Document Number Two" and exhorting him to provide more detailed and complete information, as well as the debtor's attorney's response to that letter, in which he argues the sufficiency of the responses made to the plaintiff's "Discovery Document Number Two" and reiterates the basis of his many objections to the breath and clarity of the requests contained in the same. Plaintiff's Exhibit 9 is the final letter by the plaintiff's attorney to the defendant's attorney regarding "Discovery Document Number Two" and the debtor's attorney response to that letter, in which he merely restates his position that his original response to the plaintiff's discovery request was adequate.

The Court is not inclined to make any inferences favorable to the plaintiff from the miscellaneous discovery requests and correspondence regarding the same which have been introduced into evidence. Not all of the requests made by the plaintiff's attorney in his "Discovery Document Number Two" appear, without more, to be either relevant or reasonable and the responses by the debtor to and the objections made by the debtor's attorney to portions of the same do not, without more, appear inadequate or without merit. Furthermore, the Court has thoroughly reviewed the plaintiff's discovery document and can find no question or request contained therein which on its face contemplates a response or document that would, even if produced by the debtor, show precisely when the First Commercial Bank account was closed. Therefore, even if

inferences could be made from the discovery requests and correspondence, none could be made that would assist HOC in proving a case under 11 U.S.C. § 727(a)(4)(A).

14. Even if the evidence could be construed to suggest that Mr. McAllister closed either of the accounts within the year prior to bankruptcy, there is no evidence that his omission of that information from his answer to Question 11 was purposeful or resulted from anything other than mere inadvertence. Mr. McAllister testified that he doesn't remember when the accounts were closed but that the accounts contained no funds when he closed them. He also testified that he never intended to hide the existence of either account. Indeed, in response to Question 12 in his Statement of Affairs regarding "Safe deposit boxes", Mr. McAllister disclosed a safety deposit box at First Commercial Bank, a particularly unwise thing to do if someone sincerely intended to conceal the existence of an account at the same bank. Furthermore, Mr. McAllister frankly disclosed the existence of both the Compass and First Commercial Bank accounts to his bankruptcy trustee and creditors at the first meeting of creditors. Copy of Transcript of 341 Hearing, pages 15–16, Plaintiff's Exhibit 4. And finally, the lion's share by far of the debt sought to be discharged by Mr. McAllister in this case is owed to the non-institutional lenders, including HOC, which advanced money for the purchase of cars for resale by Distinctive Motor Cars. Those lenders routinely received payments from Mr. McAllister via checks written on the two accounts in question and those lenders were therefore well aware of the existence of those accounts. It is patently unreasonable to believe that Mr. McAllister intended to conceal the existence of those accounts from creditors who had previously received checks written on those accounts. Based on those facts, HOC's objection to Mr. McAllister's discharge must also be denied because HOC did not prove, by a preponderance of the evidence, that Mr. McAllister "knowingly and fraudulently" gave a false answer to Question 11 on his statement of affairs.

ponderance of the evidence that the debtor owes a nondischargeable debt to the plaintiff in the amount of $84,835.60.[15] That sum represents the monies received by the debtor from the sale of the Oldsmobile, the Crown Victoria, the Cadillac, the Jaguar, and the Mercedes, plus interest at the statutory rate.[16] A separate order will be entered in accordance with this memorandum opinion.[17]

15. The amount of the judgment to be entered includes interest at the statutory rate from the date that the evidence shows each car was sold. The interest has been computed separately for each car. The Alabama Code provides for interest of 6% per annum on any liquidated obligation from the date the obligation should have been paid. Code of Alabama 1975, § 8–8–2 and § 8–8–8.

16. The debtor sold each of the automobiles for slightly less than he paid for them. No proof was offered by the plaintiff that indicates that the cars were sold for less than they were worth or that the debtors' failure to sell the cars for the amounts advanced by HOC was a breach of the agreement between the parties or was otherwise wrongful. By its terms, the agreement between the parties does not forbid the debtor from selling cars for less than the amount advanced by HOC. According to Mr. Gould's testimony, the decisions about the purchase price of the cars, and the price that the cars would be sold for, were left entirely to Mr. McAllister. Presumptively, if the debtor made a bad business decision by paying too much for a car, he would be penalized for that decision by having to reach into his own pocket when the time came to reimburse HOC. The Court knows of no basis for holding that the debt owed by the debtor for amounts advanced for the cars by HOC is nondischargeable. Rather, Mr. McAllister's nondischargeable transgression resulted from his failure to turn over the sales proceeds to HOC.

17. Pending at the time of trial were the debtor's *Motion for Rule 11 Sanctions* (Proceeding # 20) and *Motion for Sanctions* (Proceeding # 19). The *Motion for Rule 11 Sanctions* was filed pursuant to F.R.C.P. 11(c) and is based on the contention that the allegations contained in the plaintiff's complaint are frivolous and without legal or factual foundation. As indicated by the findings made and conclusions reached in this memorandum opinion, and in the memorandum opinion previously entered disposing of the motion for summary judgment filed by the debtor, the Court is of the opinion that the improper purpose, the legal contentions contained therein are warranted by existing law, and the factual contentions contained therein have evidentiary support. That motion, if not made moot by the findings of nondischargeability contained in this memorandum opinion, is due to be denied.

The *Motion for Sanctions* was filed pursuant to F.R.C.P. 37(c)(2) and is based on the contention that the plaintiff, namely Mr. Gould, acted improperly in answering the debtor's requests for admissions with denials. The request for admissions propounded by the debtor contained 6 requests. The plaintiff answered each of the requested admissions with a denial. However, at his deposition, Mr. Gould gave answers to questions propounded by the debtor's attorney which may be construed as admissions to five of the same statements made by the debtor in the admissions request. The Court has reviewed Mr. Gould's deposition and the explanations made by him therein as to why he denied each of the requested admissions. Based on that review, the Court is satisfied that Mr. Gould had, at the time he answered the debtor's request for admissions, reasonable reservations regarding the wording of the requests which led him to believe that his complete and unreserved admission of the requests might, without additional explanation, give the debtor and the Court a false picture of his knowledge or opinion regarding the matters referred to in those requests. Also, the Court finds that the matters referred to in the request for admissions were never seriously in issue in this case so that the admissions sought were of no substantial importance. Based on those conclusions, that motion is also due to be denied.